# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

UNITED STATES OF AMERICA,                                         :

                               Plaintiff,            Case No. 3:09-cr-049-1
                                        Civil Case No. 3:13-cv-223

                                        District Judge Thomas M. Rose
-   vs -                                         :            Magistrate Judge Michael R. Merz

GREGORY CHEW,

                             Defendant.          :

---

# REPORT AND RECOMMENDATIONS

---

This § 2255 case is before the Court for a report and recommendation on the merits. Chew filed his Motion to Vacate (Doc. No. 180) asserting one Ground for Relief -- ineffective assistance of trial counsel who allegedly "failed to subject the Government's case to any meaningful adversarial challenge" in the following ways:

> **Claim 1.**  Ms. Flagg conducted no meaningful investigation of the case and failed to hire an investigator, even though the Court had approved funds for her to do that;
>
> **Claim 2.** Ms. Flagg failed to make sure the fact witnesses were properly subpoenaed, even though she had represented that they had exculpatory testimony to give;
>
> **Claim 3.** Ms. Flagg never retained any experts, even though she had requested and been approved funds for her to do that to help explain the status of the real estate industry;

> **Claim 4**. Ms. Flagg's cross-examination of the Government's key witness was perfunctory at best;
>
> **Claim 5.** "Acquittal Jill" was unprepared and ill-equipped to represent Mr. Chew given the scope of representation needed and her personal circumstances;
>
> **Claim 6**. Ms. Flagg failed to make a post-conviction motion for judgment of acquittal; and
>
> **Claim 7**. These errors collectively and individually show that Ms. Flagg's representation of Mr. Chew fell below the objective standard for basic, competent representation.

(§ 2255 Motion, Doc. No. 180, PageID 3901-02.)  By motion after the evidentiary hearing, Chew added, over Government objection, an additional **Claim 8** -- that Ms. Flagg prevented him from exercising his right to testify in his own defense (Decision and Order, Doc. No. 219, PageID[1] 5339).


**Procedural History**


Gregory Chew was indicted by the grand jury for this District on one count of money laundering in violation of 18 U.S.C. § 1957 (Doc. No. 3, Count One, PageID 9) and twenty-four counts of structuring financial transactions so as to evade the reporting requirements of 31 U.S.C. § 5313(a) and the regulations promulgated under that statute. *Id.,* Counts Two to

---

[1] When any document is filed with this Court, the Court's electronic filing system affixes a unique Page Identification Number in the upper right hand corner of every page.  The attention of the parties is directed to this Magistrate Judge's Standing Order of May 8, 2014, which provides in pertinent part "All references to the record in this Court must be to the filed document by title, docket number, and PageID reference.  (E.g., Defendant's Motion to Dismiss, Doc. No. 27, PageID ___.)  The large majority of cases before this Magistrate Judge are habeas corpus cases with large state court records and correct citation to the record is critical to judicial economy.  Therefore, nonconforming filings will be stricken.

Twenty-Five, PageID 10-11. Having initially retained attorney Patrick J. Hanley, he had Ms. Flagg substituted as counsel on June 29, 2009 (Doc. No. 7).

On July 15, 2009, the grand jury returned a superseding indictment which added counts for conspiracy, mail fraud, and wire fraud and joined Richard Confer and Peggy Pierson as defendants (Doc. No. 28). On motion of the United States, Counts 4, 27, and 31 of the Superseding Indictment were dismissed as to Gregory Chew only (Doc. No. 68). The case was tried to a jury in March 2010 with Ms. Flagg representing Chew and attorney Lawrence Greger representing co-Defendant Peggy Pierson who was then Chew's spouse. Pierson was acquitted of the charges against her, but Chew was found guilty as charged in Counts 1, 26, 28, 29, 30, 32, 33, and 34 and not guilty on Counts 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25 (Verdicts, Doc. No. 91). Attorney John Scaccia entered his appearance as co-counsel on January 28, 2011, for purposes of dealing with the loss mitigation hearing (Doc. No. 140). After making a finding as to the amount of loss attributable to Chew for sentencing purposes, Judge Rose sentenced Chew to sixty months imprisonment on May 23, 2011 (Doc. Nos. 151, 153, 154). In doing so he departed downward by over a year from the applicable sentencing guideline range.

Chew appealed, but the Sixth Circuit affirmed. *United States v. Chew*, 497 Fed. Appx. 555 (6th Cir. 2012). As relevant to his Motion to Vacate, Chew asserted on appeal that his conviction was not supported by sufficient evidence. In rejecting that claim the Sixth Circuit wrote:

> ### 2. *Evidence of Intent to Defraud*
>
> Chew correctly argues that proof of his participation in mail fraud or wire fraud is a necessary predicate of the alleged money laundering offense, which is the object of the alleged conspiracy offense. He also correctly contends that both of these predicate

offenses require proof of intent to defraud. Chew further argues that evidence that he gave down payment monies to borrowers does not make out a criminal offense and does not, in itself, tend to show intent to defraud. Evidence that the source of the borrowers' down payment monies was known to co-defendant Richard Confer but not disclosed to the lenders is relevant, he contends, only if there was a legal duty to disclose. And although there was evidence that Confer knew of *his* duty, as mortgage broker, to disclose such information, there is no evidence that he communicated such knowledge to Chew or that Chew otherwise knew of Confer's duty. Absent evidence that he knew of such a duty, Chew contends the record fails to substantiate the finding that he concealed the information for the purpose of defrauding the lenders.[1]

> [1] In addition, Chew makes a one-sentence argument regarding the conspiracy conviction, contending "no one testified that the borrowers or Mr. Confer conspired with Mr. Chew." Appellant's brief at 52. The argument is not developed and merits no further attention. See *United States v. Winkle*, 477 F.3d 407, 421 (6th Cir. 2007) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

The record evidence, whether direct or circumstantial, tending to show Chew intended to defraud lending institutions by surreptitiously providing down payment monies to borrowers is not overwhelming. However, when the record is viewed as a whole in the light most favorable to the prosecution—with particular attention to Confer's testimony—a picture begins to emerge that would warrant a rational jury finding that Chew acted with intent to defraud.

Confer testified that he, as mortgage broker, and Chew, as "facilitator," collaborated on more than sixty loan transactions during a five-year period. He testified about the importance of the amount and source of the borrower's down payment, required to be reported in the standard Form 1003 mortgage loan application. This information tells the prospective lender about the extent of the borrower's interest in the subject property, i.e., the borrower's

"equity" or "skin in the game." Confer knew—because Chew told him so—that Chew had provided the down payment money to prospective borrowers. In these transactions, Confer knew that the loan applications submitted to the lenders did not disclose that Chew was the source of the down payment funds. Confer considered the omission of this information to be an act of deceit, a misrepresentation, but he presented the applications anyway because he wanted the applications to be approved so he would make his one-to-five percent broker fee. Similarly, when the sales transactions were closed, settlement papers were produced which also failed to disclose Chew's provision of the down payment monies, and failed to accurately disclose the fees paid by sellers to Chew for his services. Confer said that all sixty or so mortgage transactions that he and Chew had collaborated on were marked by such omissions—omissions that he considered to be deceitful misrepresentations. Confer also explained that he had, in relation to these transactions with Chew, pleaded guilty to conspiracy to launder money. He pleaded guilty because he was in fact guilty— guilty of conspiring with Chew to launder money—and he wanted to put this matter behind him.

The government's proofs also included the testimony of representatives from several of the lending institutions. Marta McCall was responsible for risk management and quality control at American Mortgage Network, the lender that issued the mortgage on one of the subject properties. McCall explained that American Mortgage Network would rely on the accuracy of the down payment information reflected in the Form 1003 loan application as reflecting the borrower's equity, i.e., the borrower's incentive to repay the loan. She testified that if American Mortgage had known that the borrower's down payment money had been provided to the borrower 24 to 48 hours prior to the closing, the loan would have been denied—not even a close question.

Kevin Walsh, of CIT Group (which had also provided a mortgage on one of the subject properties), corroborated McCall's testimony regarding the importance of the borrower's "skin in the game." In fact, Walsh explained that the importance of this factor is magnified in relation to investment property. Whereas the mortgagor of owner-occupied property has two reasons to repay

5

the loan—avoiding financial loss and avoiding homelessness—Walsh explained that the investment property borrower is only concerned to avoid financial loss. Hence, it is that much more important to the lender, in gauging risk, that the down payment on the purchase of investment property come from the borrower's own funds.

Finally, Stephen Newcomb was employed by Argent Mortgage Company as a repurchase title claims manager. He testified regarding Argent's issuance of mortgages on two of the subject properties. He testified that if Argent had known that the borrowers had not actually paid any of the down payment monies, the loans would have been denied.

The contours of the transactional context were defined and corroborated by additional testimony as well—all undisputed. Granted, the record does not appear to include evidence that Chew made any affirmative misrepresentations about the source of down payment monies. Nor is there evidence that Confer expressly advised Chew that his practice—i.e., "fronting" down payment monies to buyers so that he could be reimbursed by the sellers, with a dividend, when the mortgage was improved—was unlawful. Yet, when the record is viewed as a whole, a picture emerges from which a rational trier of fact could reasonably conclude that the "intent to defraud" element of each of the convicted offenses was proved. As explained below, we find a few salient jury instructions and legal standards defining the elements of the offenses to be of particular significance.

### 3. *Applying Law to Facts*

First, in relation both to mail fraud and wire fraud, there is no technical or precise definition of an unlawful "scheme to defraud." "The standard is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *United States v. Daniel*, 329 F.3d 480, 486 (6th Cir. 2003) (internal quotation marks and citation omitted); *Carpenter v. United States*, 484 U.S. 19, 25 n.6, 108 S. Ct. 316, 98 L. Ed. 2d 275 (1987) (noting that mail and wire fraud statutes share the same language in relevant part and that the same legal analysis

6

applies to both offenses). An unlawful scheme to defraud may consist of "concealment of a material fact." R. 139, Trial Tr. vol. X, Page ID # 2910. Further, as the district court instructed:

> A scheme to defraud includes any plan or course of action by which someone intends to deprive another of money or property by means of false or fraudulent pretenses, representations or promises. The term false or fraudulent pretenses, representations or promises means any false statements or assertions that concern a material aspect of the matter in question that were either known to be untrue when made or made with reckless indifference to their truth. They include actual direct false statements, as well as half truths and the knowing concealment of material facts.

> An act is knowingly done if it is done voluntarily and intentionally and not because of mistake or some other innocent reason.

> A misrepresentation or concealment is material if it has a natural tendency to influence or is capable of influencing the decision of a person of ordinary prudence and comprehension.

*Id.* at 2911.

The district court defined "intent to defraud" as "intent to deceive or cheat for the purpose of either causing a financial loss to another or bringing about a financial gain to one's self [or] to another person." *Id.* at 2911-12. To satisfy this element, the evidence had to show not only that there was a material misrepresentation or knowing omission of material fact, but also that the misrepresentation or omission was made with the purpose of inducing the victim to part with money or property or to undertake some action that would not otherwise have been undertaken. *Daniel*, 329 F.3d at 487.

Significantly, the jury was also instructed that Chew could be found guilty of mail fraud and/or wire fraud as an aider and

7

abettor, without having "personally committed the crime," if he was found to have "intentionally helped or encouraged someone else to commit the crime." R. 139, Trial Tr. vol. X, Page ID ## 2912-13, 2919-20.

Given the undisputed testimony of the lending institution representatives about the materiality and importance of information regarding the borrowers' equity in the property purchased in assessing risk and approving loan applications; and given Confer's testimony about his knowing and deceptive concealment or nondisclosure of Chew's practice of surreptitiously gifting down payment monies to borrowers just prior to the closings to enhance the borrowers' apparent creditworthiness and improve the likelihood of mortgage approval; and given the extent of Chew's collaboration with Confer in more than sixty such transactions, it is apparent that a rational juror could reasonably conclude beyond a reasonable doubt that Chew had intentionally helped or encouraged Confer to obtain money from lenders by a scheme that included half-truths and omission/concealment of material facts. The record thus includes sufficient evidence to establish the required "intent to defraud" element of the predicate mail fraud and wire fraud offenses. Chew's only sufficiency-of-the-evidence challenge therefore fails.

Although the evidence against Chew was not overwhelmingly strong on all essential elements, considering the broad nature of some elements of the charged offenses and the deferential standard of review, Chew has failed to carry his heavy burden of demonstrating insufficiency of the evidence to support the convictions. It follows that all eight convictions, on one count of money laundering, one count of conspiracy to launder money, and three counts each of mail fraud and wire fraud, must be affirmed.

*Id.* at 561-64.

The instant Motion to Vacate was filed July 10, 2013 (Doc. No. 180). An evidentiary hearing commenced on February 21, 2014, and was completed on March 5, 2014 (Minute Entries on docket for relevant dates). Attorneys Greger and Scaccia appeared as witnesses for

8

Chew during the hearing.  The testimony has been transcribed (Doc. Nos. 206-12) and the Motion to Vacate is ripe for decision on the post-hearing briefs (Doc. Nos. 217, 220-21).

**Generally Applicable Law**

The governing standard for ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . .  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694.  *See also Darden v. Wainwright*, 477 U.S. 168 (1986); *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987).

# Analysis

## Claim One:  Lack of Adequate Preparation

In his First Claim, Chew asserts Ms. Flagg "conducted no meaningful investigation of the case and failed to hire an investigator. . ." (Post-Hearing Brief, Doc. No.217, PageID 5313).  The failure to hire an investigator is undisputed.   In terms of reviewing the documents the Government made available in discovery, Mr. Chew testified he and Ms. Flagg went together to a warehouse where the documents were stored once or twice for a couple of hours, reviewed a couple of hundred documents, and copied 150 to 200 of them. *Id.*  at PageID 5297.  This is contrasted with the ten to fourteen full days that co-defendant Pierson's attorney, Lawrence Greger, testified he spent reviewing the produced documents. *Id.*

Although Chew has shown Ms. Flagg spent less time reviewing documents than did Mr. Greger, he has not shown any prejudice arising from the amount of review that was done.  That is, he has not shown what more would or could have been discovered which would probably have affected the outcome of the case, given that he was acquitted on most counts.  What more is

in the documents that Ms. Flagg could have discovered if she had copied more than 150-200 of them? Without some showing of what more was in the documents that would have been useful or for that matter what an investigator could have found, there is no proof of ineffective assistance of trial counsel on Claim One.

**Claim Two: Failure to Subpoena Fact Witnesses**

Chew testified Ms. Flagg told him her strategy would be to subpoena numerous individuals to testify about the specific transactions involved in the case as well as the state of the real estate industry at the time and he agreed with that strategy. *Id.* at PageID 5298.

On February 16, 2010, ten days before trial, Ms. Flagg moved the Court to issue subpoenas for the keepers of records of Huntington National Bank at three locations, Liberty Savings Bank in Centerville, Fifth Third Bank in Bellbrook, and JP Morgan Chase Bank in Dayton; Craig Looper; Michael Looper; Timothy Gilchrist; Jeff Compton; Dejuan Ware; bank officers Debbie Gross, Faye Fedders, Linda Robinson, Sarah Tullis, Brenda Baker, and Angela Trout; and Richard Confer (Doc. No. 59, PageID 284-85). She represented that these witnesses were necessary for trial and indeed "the Defendant cannot safely go to trial without them." *Id.* at PageID 285. She also requested that Peggy McCormick, a local process server, be appointed to make service. *Id.*

The Motion was granted and the subpoenas issued. It is undisputed that none of these witnesses was called in the defense case in chief, although the records keepers were called by the Government or not needed. Ms. McCormick, who has a reputation as one of the best process

servers in the area, was able to find appraiser Craig Looper, but unable to serve Messrs. Confer, Looper, Gilchrist, Compton, and Ware. *Id.* at PageID 5299.

As Chew admits and the Sixth Circuit's opinion makes clear, Richard Confer was the Government's "star" witness. He was added to the case as a co-defendant in the Superseding Indictment and entered into a Plea Agreement with the Government on February 19, 2010, about a week before trial (Doc. No. 60).

Chew takes contradictory positions about Confer, complaining in this Claim that Ms. Flagg did not successfully subpoena him and in Claim 4 that she did not successfully cross-examine him. Given Confer's testimony and the fact that he was present for trial had the defense needed to call him, Chew suffered no prejudice from Attorney Flagg's failure to subpoena him.

To prove deficiency on this Claim, Chew notes that Ms. Flagg asked Judge Rose to "enforce" her subpoenas just before trial and he responded that he would enforce those that had been properly served. A competent attorney of course knows that the Court cannot enforce subpoenas that have not been served and the inference Chew wants the Magistrate Judge to draw is that Ms. Flagg did not know this and acted incompetently in failing to provide Ms. McCormick with adequate addresses for these witnesses.

However, assuming it was deficient performance to fail to subpoena Michael Looper, Timothy Gilchrist, Jeff Compton,[2]and Dejuan Ware, Chew has not shown any prejudice flowing from their failure to testify. Chew did not show at the evidentiary hearing that any of them would have given testimony valuable to his case and FBI Forensic Accountant Susan Sigler confirmed that all of these appraisers faced disciplinary action from the Ohio Department of Commerce regarding their appraisal licenses (Hrg. Tr., Doc. No. 211, PageID 5142.)

---

[2] Alternatively spelled "Compston" at places in the record.

Chew's Second Claim of ineffective assistance of trial counsel fails for lack of proof of prejudice.

**Claim Three: Failure to Retain Experts to Explain the Status of the Real Estate Industry**

Chew asserts that Ms. Flagg provided ineffective assistance of trial counsel when she failed to call an expert to explain the status of the real estate industry at the time of the transactions which gave rise to the charges.

On November 3, 2009, Ms. Flagg moved the Court to provide funds to retain a mortgage fraud/structuring expert and in fact suggested Thomas Lekan as that expert, representing to the Court that he had been qualified as an expert on these subjects in other courts in Ohio (Motion, Doc. No. 53, PageID 265.) That Motion was granted and Ms. Flagg did retain and consult with Mr. Lekan. He was not called as a witness at trial, apparently because he advised Ms. Flagg shortly before trial that his testimony would not be helpful to Chew. However, he did provide Ms. Flagg with a power point presentation to acquaint her with the subjects on which he was retained and Chew was acquitted on all the structuring counts on which he was indicted.

Chew argues that, instead of Mr. Lekan, Ms. Flagg should have retained someone like William Alexander, a person he testified he identified to her, or Douglas Finke, a real estate appraiser who testified at the loss mitigation hearing. Both men testified at the evidentiary hearing in this § 2255 proceeding.[3]

Douglas Finke testified that he had been appraising real estate for Henkaline and Associates since 1989 (Hrg. Tr. Doc. No. 206, PageID 4066). He is certified as a residential real

---

[3] The Magistrate Judge heard the Finke and Alexander testimony after an extensive education in the lender and appraiser practices that led to the real estate collapse in presiding over the three-week trial in *Wells Fargo Bank NA v. LaSalle Bank National Association*, Case No. 3:07-cv-449.

estate appraiser by the State of Ohio for one to four-family homes. *Id.* at PageID 4067-69.  As an appraiser, he is usually contacted by the prospective lender on a property to do the appraisal. *Id.* at PageID 4070.  Having looked at the property, he would then begin to search for comparable properties that had recently sold. *Id.* at PageID 4071-73.  Various sources are available for that information, including the Multiple Listing Service of the Dayton Area Board of Realtors ("MLS"). *Id.* at PageID 4073-74.  Appraisals are to be done in accordance with the Uniform Standards of Professional Appraisal Practices. *Id.* at PageID 4074.  The MLS was not widely used by appraisers in 2008 because many did not want to pay for it, but it provides more data from which to do a competent appraisal. *Id.* at PageID 4075.

Finke testified that the final appraised fair market value of a property is one number, arrived at after making adjustments from comparable properties.  *Id.* at PageID 4077.  In addition to original appraisals, he would also do review appraisals – reviewing another appraiser's work to make sure they've done a competent job.  *Id.* at PageID 4078. However, these are usually done with a "desk review" or "drive by" of the property.  *Id.* at PageID 4080.

The real estate appraisal industry was quite different in 2008, in Finke's opinion, than it had been for a number of years before that because of the real estate collapse in 2007.  *Id.* at PageID 4081.  The main difference was that appraisers are no longer permitted contact with lenders. *Id.* at PageID 4081.  The reason for this was that lenders could pressure appraisers to come up with a value that suited the lender.  *Id.* at PageID 4081-82.  At the same time, it was the lender who chose and compensated the appraiser.  *Id.* at PageID 4082.  He would not consider a value that the lender wanted,  but is certain there were many appraisers who did.  *Id.* at PageID 4085.  Now appraisal management companies have taken over the underwriting of loans and

ordering appraisers, largely as a result of Frank Dodd.[4] *Id.* at PageID 4085. Prior to the reform, lenders would frequently give a suggested value and appraisers, like himself, who would not be influenced by that suggestion would not be picked by lenders to do appraisals. *Id.* at PageID 4086.

Finke had been hired previously in this case by John Scaccia to assist with the loss mitigation proceeding. *Id.* at PageID 4088. He would have been available to testify if retained to do so in 2009 at the time of trial. *Id.* He testified at some length about problems he found with the appraisals that had bene done in connection with the five properties at issue at trial. *Id.* at PageID 4088, et seq. He ultimately testified that the only person responsible for the content of an appraisal is the appraiser himself or herself. *Id.* at PageID 4118.

William Alexander studied business management at Wright State University and became a loan officer right after graduating in 1997. *Id.* at PageID 4132-33. He was recruited by a friend who was "producing loans and was doing very well" at Right Choice Mortgage. *Id.* He successively worked as a loan officer at Charter First Banc, Multi-State Mortgage, and National City Mortgage (later acquired by PNC Bank). *Id.* at PageID 4134-35. The qualifications for being a mortgage broker have stiffened over time – most of the brokers Alexander knew in the late 1990's and early 2000's were out of the business by the time he testified. *Id.* at PageID 4138.

Alexander testified the lending standards in the mortgage lending industry from 2003 to 2008 were very loose. *Id.* at PageID 4141. "There were so many programs that you could find a place to put a borrower into, I almost called it the Wild Wild West." *Id.* There were programs which required no or very light documentation and in which really low credit scores were

---

[4] The Court understands the reference to be to the Dodd-Frank Wall Street Reform and Consumer Protection Act, enacted by Congress on July 21, 2010.

acceptable. *Id.* All sorts of people were coming into the industry from, e.g., pizza businesses. *Id.* at PageID 4142. Loan officers received no salary; they were paid out of the loans they produced. *Id.*

Alexander described the kinds of documentation of income required on various loans. *Id.* at PageID 4149-50. However, the average loan officer on a stated value loan would not even question the potential borrower's stated value. *Id.* at PageID 4150. On a "no doc" or no document loan, the HUD Form 1003 would be blank on the amount in the bank. *Id.* at PageID 4152. These subprime loans were as much as 22 percent of the market in 2006, but were down to less than 1% of the market at the time of the § 2255 hearing. *Id.* at PageID 4154. Alexander characterized the mindset as follows:

> I call them moral hazards. There were programs that should not have been out there but they were due to the demand. The lenders put the programs out because the investors on Wall Street, everyone was making so much money, and the risk models, they were comfortable with at the time. And one big part of the equation was everyone – the housing prices were going up and the mind-set is they didn't think that they were going to crash, too.

*Id.*

In the loan application process, "sourced funds" are funds as to which the lender knew the source. *Id.* at PageID 4156. During the mid-2000's, lenders were not checking sources. "Seasoned funds" are those which have been in the borrower's account for sixty days. *Id.* at PageID 4158. Alexander confirmed Finke's testimony about loan officers communicating the value on a residence to the appraiser and cutting the appraiser out of the business if they didn't get the value they wanted. *Id.* at PageID 4163.

Summarizing this expert testimony in the Post-Hearing Brief, Chew's present counsel[5] argues that if this testimony had been presented at trial, the jury would have understood better than it did how loose the loan requirements were at the time of the transactions in question, that sometimes a lending institution did not care where funds for the downpayment came from  (Doc. No. 217, PageID 5308).  Furthermore, it is argued that experts could have testified at trial that outside third parties like Chew "do not have any obligation to take responsibility for the preparation of loan documents or appraisals." *Id.*  Rather, the responsibility is on the loan officer.

It is highly doubtful that this testimony would have overcome that of Mr. Confer who was Chew's co-conspirator in these transactions.  Chew was complicit in the misrepresentations made to the lending institutions and himself provided the funds from which the borrowers paid the down payments.  However "loose" the lending arrangements were, no one testified at the § 2255 hearing that what Chew did in these five transactions was lawful.  That Chew knew it was unlawful can be inferred from the secretive methods he used to convey the money.

The argument could perhaps be made that testimony like Finke's and Alexander's would have shown the jury how reckless the whole industry was and that Chew was no more guilty than others.  Such an argument is of the variety "everyone is doing it, so it can't be so bad."  This would not have been a legitimate argument for counsel to make, coming close to an appeal for jury nullification of the mail fraud and wire fraud statutes as applied to this industry.  It is not ineffective assistance of trial counsel to fail to call witnesses who would only have supported such an argument.

Alternatively, testimony such as that given by Finke and Alexander, if presented just to show the state of the real estate industry at the time of these transactions, might have been

---

[5] Referring to counsel who filed the brief, Sasha Alexa M. Blaine (fka VanDeGrift).  Because of her change of employment, Ms. Blaine has been replaced as counsel for Mr. Chew.

instructive to the jury about the milieu in which Chew operated. But it cannot be said that background testimony like this would have been critical to the case. Neither Finke nor Alexander testified directly that what Chew did was legal.

The Magistrate Judge concludes it was not ineffective assistance of trial counsel to fail to call at trial experts who would have testified as Finke and Alexander did at the § 2255 hearing.


**Claim Four: Perfunctory Cross-Examination of Richard Confer**


In his Fourth Claim, Chew asserts Ms. Flagg's cross-examination of Richard Confer was "perfunctory at best." (§ 2255 Motion, Doc. No. 180, PageID 3901-02.) As is clear from the Sixth Circuit's opinion, Confer was by far the most important witness against Chew. But Chew's Post-Hearing Trial Brief is very skimpy in its argument on this claim. What questions should Ms. Flagg have asked that would have undermined the content of Confer's testimony or his credibility, given that the jury knew he had accepted a plea agreement to testify against Chew? What answers would Ms. Flagg have received to those questions which would have been beneficial to Chew's case?

Attorney Lawrence Greger offered his opinion at the hearing that the cross-examination was ineffectual (Doc. No. 217, PageID 5321, without record citation). Mr. Greger has a well-deserved reputation at the local bar for a very vigorous cross-examination style. It is certainly conceivable that, by the style of cross-examination, someone like him may have been able effectively to communicate his own doubt about the case to the jury. The law does not permit a defendant to call an attorney to testify to his opinion that there is reasonable doubt, but a scornful

or sarcastic tone in cross-examination may have the same effect. But it is not ineffective assistance of trial counsel to fail to adopt such a style.

Claim Four is without merit.


**Claim Five: Lack of Preparation and Attention**


Although this claim is made in the § 2255 Motion, it is not carried forward in the Post-Hearing Trial Brief (Compare Doc. No. 180 at PageID 3901-02 with Doc. No. 217 at PageID 5313-14).


**Claim Six: Failure to Make a Post-Conviction Motion for Judgment of Acquittal**


In his Motion to Vacate, Chew asserted Ms. Flagg provided ineffective assistance of trial counsel when she failed to file a post-conviction motion for judgment of acquittal (Doc. No. 180, PageID 3901-02). Although the Post-Hearing Trial Brief does not say so explicitly, Chew appears to have abandoned this claim because it is not argued. In fact, it is without merit because Ms. Flagg did file a post-conviction motion for judgment of acquittal (Doc. No. 101).


**Claim Eight:[6] Preventing Chew from Testifying**


The Court permitted post-hearing amendment of the § 2255 Motion to assert a claim that Ms. Flagg prevented Chew from testifying because the issue had been the subject of testimony during the hearing (Doc. No. 219). However in the Post-Hearing Brief Chew's counsel attempts

---

[6] Claim Seven is treated last for reasons which will be apparent from the content of the analysis.

to expand the claim to include a claim that Ms. Flagg "provided him inadequate advice about the ramifications of testifying."  (Doc. No. 217, PageID 5322.)  This latter portion is beyond the amendment that was permitted and will not be considered.

Chew correctly argues that the decision whether or not he will testify is the client's alone (Post-Hearing Brief, Doc. No. 217, PageID 5322, citing *Rock v. Arkansas*, 483 U.S. 44 (1987), and *United States v. Webber,* 208 F.3d 545 (6th Cir. 2000).

The record reflects that both Mr. Chew and Ms. Pierson rested their cases without presenting any witnesses, including themselves (Trial Tr., Doc. No. 137, PageID 2768.)  Chew's counsel has pointed to nothing on the record regarding his taking the stand aside from the citation just given.  In the Post-Hearing Trial Brief, Chew's counsel asserts "Mr. Chew testified that when Ms. Flagg told him she wanted to rest without presenting any witnesses or evidence, he insisted on testifying so that someone could tell his side of the story." (Doc. No. 217, PageID 5322 with no record reference.)

Testifying as a witness in his own behalf at the § 2255 evidentiary hearing, Chew testified he told Ms. Flagg he wanted to testify himself at trial (Hrg. Tr., Doc. No. 208, PageID 4540).  He testified her response was "that would not be good and she did not want to do it because of my prior conviction." *Id.*  at PageID 4541.  Ms. Flagg's testimony on this subject was much more extensive that her former client's:

> We began discussing Mr. Chew potentially testifying from the onset of my representation, his mannerisms, what he might say, what we might highlight if he would potentially testify. But we also talked about the former conviction and how that would affect him.
>
> Q. If I was to ask you to estimate how many times you had discussions on this subject, do you have any idea?

A. At least ten or fifteen throughout my representation.

Q. When and how was the final decision made that Mr. Chew was not going to testify?

A. Well, it's my practice and -- it's my practice to tell my clients that it's their choice to testify or not to testify. And I did that same thing with Mr. Chew. I told him that it was his choice. And then we discussed the pros and cons of him testifying in this case. And one of the big cons was that he had a prior conviction that the jury had not heard about and would not hear about in the government's case in chief; so, therefore, if he took the stand, his former fraud conviction would be conveyed to the jury, and maybe some details of that.

Q. Who made the final decision?

A. Mr. Chew.

Q. Any question in your mind?

A. No.

Q. Now Mr. Chew's description that you prevented him from testifying, is there any truth to that?

A. No.

(Hr. Tr. Doc. No. 211, PageID 5028-29.)

Chew's counsel admits that there is a flat contradiction between Mr. Chew's and Ms. Flagg's testimony on this point and that no other person testified on it so "this Court must decide whether to believe Mr. Chew or Ms. Flagg." (Post-Hearing Trial Brief, Doc. No. 217, PageID 5323.) This precedes an argument why the Court should believe Chew based on other facts which counsel believe undercut Ms. Flagg's testimony. *Id.* at PageID 5323-24. Nothing intrinsic to their testimony on this particular question is relied on, but Ms. Flagg's is intrinsically

more believable.  She testifies that what she did here is consistent with her usual practice in criminal cases – giving the client advice about testifying, but not trying to make the decision on her own.  She testified about having had the discussion with Chew many times during the course of the representation, which seems more likely than that it would have been discussed only once.

Finally, of course, her advice was wise.  Chew believed he could be asked about his prior conviction on direct and this would "take the sting out of it."  In the Court's view, that is either self-serving hindsight or, if it was his view all along, naïve.  It is not a prior conviction for shoplifting or some other minor dishonesty matter.  Instead, it was a prior felony fraud conviction related to his involvement in the mortgage business.  It is because prior convictions are so telling with a jury that the law excludes them unless a defendant voluntarily takes the stand.  The Court feels virtually certain that the prior conviction would have made the jury more likely to convict.  Mr. Scaccia rendered an opinion to the contrary, but his opinion on the matter is very unpersuasive to the Court given his own disciplinary difficulties.[7]

The trial record shows no protest by Chew personally against his not being allowed to testify.  The record is therefore as consistent with his having acquiesced in Ms. Flagg's advice as being somehow prevented from testifying.

The Magistrate Judge finds that Ms. Flagg did not prevent Chew from testifying at trial and Claim Eight is therefore without merit.

---

[7] As of January 22, 2015, Mr. Scaccia is under an Order to Show Cause from Chief Judge Sargus why he should not be found in contempt of this Court for failure to obey a prior disciplinary order.

**Claim Seven: "Cumulative" Ineffective Assistance**

As phrased in the Motion to Vacate, Claim Seven is that "[t]hese errors collectively and individually show that Ms. Flagg's representation of Mr. Chew fell below the objective standard for basic, competent representation."  (Doc. No. 180, PageID 3902.)  In the Post-Hearing Brief, Chew argues "Trial counsel's individual and cumulative errors were prejudicial. Even if this Court could find legitimate reasons justifying each and every one of Ms. Flagg's actions, they collectively show that Ms. Flagg had no reasonable strategy for how to defend Mr. Chew." (Post-Hearing Trial Brief, Doc. No. 217, PageID 5325.)

In deciding an ineffective assistance of trial counsel claim, a court must weigh cumulatively the prejudice flowing from discrete failures to perform competently.  "[E]xamining an ineffective assistance of counsel claim requires the court to consider 'the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case.'" *United States v. Dado,* 759 F.3d 550, 563 (6th Cir. 2014), quoting *Lundgren v. Mitchell,* 440 F.3d 754, 770 (6th Cir. 2006); accord, *Stewart v. Wolfenbarger,* 468 F.3d 338, 361 (6th Cir. 2004); *Mackey v. Russell*, 2005 U.S. App. LEXIS 16933 (6th Cir. 2005); *Bays v. Warden*, 2012 U.S. Dist. LEXIS 182608 (S.D. Ohio 2012)(Merz, M.J.)

But Chew seems to be arguing something additional, to wit, that individual mistakes of counsel, while not in themselves constitutionally deficient performances, can be accumulated to make a deficient performance on the case considered as a whole (See Post-Hearing Brief, Doc. No. 217, PageID 5326).  However, that argument is interwoven with the legally correct claim that prejudice must be weighed by considering the "totality of the evidence."  *Id.*, citing *Higgins v. Renico*, 470 F.3d 624, 634 (6th Cir. 2006).

Chew also relies on *Stouffer v. Reynolds*, 168 F. 3d 1155 (10th Cir. 1999).  This was a capital case in which the Petitioner alleged a number of specific instances where his counsels' conduct was said to fall below an objective standard of reasonableness.  The Tenth Circuit did suggest that the individual failures of petitioner's counsel might cumulatively amount to a viable *Strickland* violation, to wit, "a fundamental lack of formulation and direction in presenting a coherent defense." *Id.* at 1164.  It left that determination in the first instance to the district court, to whom the case was remanded for an evidentiary hearing under pre-AEDPA standards.

*Stouffer* comes closest of the cited cases to supporting Chew's "deficient performance as a whole" theory, but he cites no Sixth Circuit authority for that proposition.  *Stouffer* is distinguishable because it is a capital case in which the appellate courts have insisted on much more diligence by trial counsel than in non-capital cases, as *Stouffer* itself recognizes. 168 F.3d at 1168, citing *Lockett v. Ohio*, 438 U.S. 586 (1978).

Assuming *Stouffer* states the law as the Sixth Circuit would find it to be, Ms. Flagg did not lack a coherent theory.  It was to create reasonable doubt in the jury's mind that Chew intended to defraud anyone since he was participating in an industry that was, at the time, very loose about representations and required documentation.  Chew's present counsel admits she tried hard to put Chew's behavior in a context the jury would understand and accept by analogizing it to the conduct shown in the television series *Flip This House*.[8]  Attorney Scaccia admitted during the § 2255 hearing that this was a reasonable approach.  Of course, it was badly undercut when Confer made a deal with the United States and testified against Chew.  While that was always a risk, it did not come to fruition until shortly before trial.

---

[8] According to Wikipedia, this series ran for five seasons between 2005 and 2009.

**Conclusion**

Attorney Flagg provided constitutionally deficient performance in her failure to properly subpoena fact witnesses, but the failure did not prejudice Chew because most of the witnesses were called by the Government and the ones who did not appear were readily impeachable or Chew has failed to show what useful evidence they would have given. As to the balance of Chew's claims of deficient performance, he has failed to persuade the Court.

Accordingly, it is respectfully recommended that the § 2255 Motion be DENIED. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*.

January 26, 2015.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).